# McCORMICK *v.* CLEAL.

PATENTS; INTERFERENCE; PRACTICE; REFRESHING MEMORY
OF WITNESS.

1. An application for a patent is a constructive reduction to practice,
and will be taken as the date of the applicant's conception, in
the absence of other evidence in respect thereof.
2. In an interference proceeding, the burden of proving conception
antedating the conception of his rival is upon the junior appli-
cant, together with the burden of proving reduction to prac-
tice, or such diligence in following up his conception as will
support his right founded thereon.
3. It is not necessary that documents from which a witness has
refreshed his memory should be produced at his examination,
although the failure to do so may cause his testimony to be
regarded as of little weight; and when produced and used to
assist the memory of the witness, they need not be offered in
evidence, and ordinarily they would be inadmissible if offered.
4. Perfected drawings of an invention for use in the Patent Office
cannot be regarded as reduction to practice.
5. In an interference case, where one of the applicants claims he used
due diligence after conception in reducing his invention to
practice, a reasonable indulgence will be extended to him, if
lapse of time only is in the way, where he is shown to have
been engaged in perfecting and attempting to bring out all
the merits of his invention.

No. 81. Patent Appeals. Submitted January 11, 1898. Decided February 24, 1898.

HEARING on an appeal in an interference case from a
decision of the Commissioner of Patents. *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Paul A. Staley* for the appellant.

*Mr. Edward Rector* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. This is an interference proceeding in the matter of an
improvement in department cash registers, and the contro-
versy is on the following issue:

"In a cash register, the combination of a series of num-

bered keys representing different amounts, a series of special keys, and locking means controlled by the special keys to prevent operation of the numbered keys until a special key has been operated."

The object of the "department" cash register is to preserve in a single machine distinct and separate records of the sales of different classes of articles. For example, in a drug store there may be special departments, say, of drugs, of soda-water, cigars, etc.

Registers called "department machines" were old when the invention in controversy was made. In these there were provided separate registering machanisms for each department, which were operated by special keys appropriately labeled. There is one set of numbered keys called "cash keys." In order to register a sale in the proper department, it is necessary that the register assigned thereto shall be thrown into co-operation with the cash keys before the registration can take place. If, therefore, a department register is not thrown into co-operation, as aforesaid, the amount of the sale expressed on the cash key will not be added upon the same, and so, the cash keys being free to operate whenever pressed, if at the end of an operation of the machine any one of the department registers shall be left in position to co-operate with the cash keys the registration will take place therein, whether it be the appropriate one or not.

2. The improvement in the invention in controversy consists in the introduction of a locking device between the different sets of keys, whereby the operation of the cash keys is prevented until the special department register has been thrown into co-operation. The cash keys are normally locked and can only be operated when a department key is pressed and the register thrown into co-operation. There is a connection between the locking device and the department keys by which the latter in moving the register unlock the cash keys and thus permit of their operation.

3. The applications for patents for this improvement, out

of which the interference grew, were filed three months apart. The first was filed by the appellee, Joseph P. Cleal, July 6, 1894; the second by the appellant, John H. McCormick, October 6, 1894. Cleal's application is a constructive reduction to practice, and must be taken also as the date of his conception, because he has introduced no evidence in respect thereof. McCormick, being the junior applicant, had the burden of showing conception before Cleal's date of filing, together with reduction to practice, or such diligence in following up his conception as will support his right founded thereon.

4. The examiner of interferences and the examiners-in-chief, on appeal from him, awarded priority to McCormick, on the ground that he was the first to conceive and had not been wanting in diligence in reduction to practice.

The Commissioner reversed the decision of the examiners-in-chief, and awarded priority to Cleal. He was of the opinion, first, that McCormick's evidence of conception was not satisfactory, and second, that had he conceived as alleged, he would have lost his right for lack of diligence in reduction to practice.

McCormick had been at work upon cash registers since 1892, and claims to have conceived the idea of the locking device of the issue in or about October, 1893. He claims that he explained it to others in December, 1893, and made drawings illustrating it about the same time.

The doubt of the Commissioner in respect of this claim of invention is founded on the evidence concerning these first drawings, called 1 and 2. These illustrate several features of complicated department machines. No. 2 is in ink and pencil. The part in ink is said to have been traced from or after No. 1. The part in ink does not show the detail of the subject-matter of the controversy at all. That appears in a pencil sketch added to the ink drawing some time after its execution. Appellant's witnesses did not explain when this pencil sketch was added, and they were

12 Ct. App.—23

not cross-examined with regard to it.   Those witnesses were not contradicted or impeached.   Giving them credence, as we must, the testimony is overwhelming that this detail was in drawing No. 2 in February, when the drawings were made for use in the Patent Office and the specifications were prepared in the office of appellant's solicitor.   These latter dates were fixed with certainty by the draftsman, by a mechanic who worked on the McCormick machines, two stenographers, and the solicitor, as well as by McCormick himself.   Dates were fixed by the solicitor's office records and the note-books of the two stenographers.   The mechanic assisted his memory by a receipted bill for certain patterns made for his use, and the draftsman testified to referring to drawing No. 2 in preparing the drawings and identified two "blue-prints" made at the time as copies thereof.   The note-books, records, bill, and blue-prints were not offered in evidence, and for that reason the Commissioner was of the opinion that the proof of dates by reference to them should be disregarded.   This view is clearly erroneous.   It is not even necessary that documents from which a witness may have refreshed his memory be produced at the examination; but the failure to do so would often cause the evidence to be regarded as of little weight.   When produced and used to assist the memory, they need not be offered as evidence, and in the majority of instances they would be inadmissible if offered.   1 Greenl. Ev., Sec. 437; *Commonwealth* v. *Ford,* 130 Mass. 64, 66; *White* v. *Tucker,* 9 Iowa, 100.

The documents referred to by the witnesses were all produced, as the record shows.   Counsel for the appellee had an opportunity to inspect them and to cross-examine the witnesses in respect of them.   He did not cross-examine, and it does not appear that he inspected the instruments; but the record does not show that he offered or asked leave to do so.   So far as that shows any action by him, it is that he objected to the reference to them on the ground that they were secondary evidence.   We can not indulge any other

presumption from his conduct than that he was at the time satisfied in respect of the genuineness of the records and of their dates.

On this issue our conclusion necessarily is that McCormick conceived the idea of the invention in controversy, communicated it to others, and made a satisfactory drawing illustrating it as early at least as February, 1894.

5. Appellant's claim that the perfected drawings showing forth his invention must be regarded as a reduction to practice is inadmissible. Unless he can show an actual reduction to practice, or diligent endeavor to that end commencing before his rival's application was filed and continuing to the date of filing his own, the decision must be against him.

It appears from the evidence that McCormick did not make a machine embodying this particular detail before Cleal's date of application. He worked on a machine which is called "machine No. 3" in the testimony; but he did not make and attach the locking device thereto. The construction admitted of the attachment and seems to have been made with that view. Machine No. 3, then, was not a reduction to practice. Of his two sets of specifications made in February, 1894, for applications for patents, he filed one on March 5, 1894, for what is called his "machine No. 4," upon which he has obtained a patent. The specifications under which No. 3 had been begun are those contained in the application in interference, which, as we have seen, was not filed until October 6, 1894. "Machine No. 5" was begun by McCormick in April, 1894, and finished some time during the summer. This differed from No. 4 in the mechanism of the drawer, in respect of its action in opening and closing, and in some other details not affecting the matter at issue. Both had the same locking device, however, operating in the same way. In each the department keys are nominally locked, and the cash keys are free. The operation is first to press in the cash key. This does not register, but sets the

machine so that when a department key is pressed the registration takes place.

In the issue of the interference the specific description is "a locking means controlled by the special keys to prevent operation of the numbered keys until a special key has been operated."

This means a mechanism whereby the cash keys are kept locked until the department key is pressed in. Here the department or special key sets the machine for registration and unlocks or releases the cash or numbered keys, so that when pressed in the desired registration is accomplished.

It appears that the locking mechanism of the issue aforesaid and those of machines 4 and 5 are alike. They differ merely in the time of the operation of the two sets of keys. The operation of one is simply reversed in the other. In the former the department key is first pressed, and the cash keys are thereby unlocked. In the latter the cash keys are first pressed, and the department key is thereby unlocked. The change in the time of the operation is by a process requiring nothing more than ordinary mechanical skill. The locking of the keys is accomplished by means of a hook attached to a rod, and the change in the time is worked by a change of the hook. If this hook engages at the bottom, the keys are locked before the operation; if at the top, they are locked afterward.

Notwithstanding the conditions shown above, each tribunal of the Patent Office agreed in holding that on account of the state of the art and the terms of the applications "the words of the issue," as said by the Commissioner, "instead of being a mere statement of function, are a specific limitation of the claim to means to control the numbered keys until the special key is operated."

We are not satisfied of the correctness of this view, but will pass the point, because its determination is not necessary in our view of the question of diligence. There was no testimony from the mechanical experts on the point beyond

that of McCormick himself, and to go into the question would involve the consumption of much space in the discussion of the descriptions contained in the elaborate specifications of each application.

6. This brings us to the consideration of the final question: Did McCormick lose the advantage of his earlier conception through lack of diligence in reduction to practice before his rival's application was filed? This question of diligence can not be determined by any general rule applicable to all cases. It necessarily depends upon the special circumstances of each case as it arises. Now if we had nothing else in the case than the fact that McCormick made the invention and had his drawings and specifications prepared as early as February 20, 1894, and yet withheld them from the Patent Office for about eight months, we would be compelled to decide against him, for no ample excuse for delay can be found in the situation and conditions of the parties or the business engagements of their solicitor apart from other considerations. *Dodge* v. *Fowler*, 11 App. D. C. 592; 82 O. G. 595.

In our opinion, however, there are other important considerations that tend to excuse the delay.

As we have seen, McCormick began with sufficient promptness the construction of his machine No. 3, with the intent to apply therein the locking device of his drawing No. 2 in the very manner described in the issue. This fell short of being a reduction to practice, because he did not in fact apply the mechanism thereto. He had also worked on machine No. 4, and the Patent Office drawings were drawn therefor and the application was speedily filed. In the meantime No. 3 was laid aside for No. 4, which contained some additions respecting the operation of the machinery of the registers in connection with the cash drawer that were novel and supposed to be valuable. Reversing the action of the locking mechanism between the keys from that contemplated in the proposed construction of No. 3 was caused by the changes in

the aforesaid action of the registering machinery in co-operation with the drawer. Part of the machinery used in No. 4 was taken off and used in machine No. 5, which was supposed to improve thereon in some slight particulars. The operation of the locking machinery was the same in No. 5 as in No. 4, and for the same reason.

Conceding, as we have done, that there may be a substantial difference of means in the different times of the operation of the locking device upon the cash keys as carried out in machines 4 and 5 and in the machine of the issue, and conceding, further, that the latter mode of operation is superior, yet it does not appear that this superiority was then apparent.

Judging by the action of McCormick, we may conceive that he neither saw the superiority of one mode of operation over the other at the time, nor apprehended that there was a substantial difference between the functions of the mechanism in merely reversing the time of the locking action upon the distinct sets of keys. He was certainly diligent in constructing and perfecting his machine along the line of its then apparent importance to him. The locking device was the important improvement. He appreciated its value, though he may have been mistaken as to the most advantageous mode of its operation, and may also have for a time supposed that it was the same invention when operating reversely.

In the light of these circumstances we can not regard his delay as inexcusable. It would be unjust to do so. Some reasonable indulgence where lapse of time only is in the way ought to be extended to an inventor who was thus engaged in perfecting and attempting to bring out all of the merits of his invention.

For the reasons given we are of the opinion that priority should be awarded to the appellant.

The decision appealed from will therefore be reversed, and the proceedings and decision of this court will be certified to the Commissioner of Patents, as required by law. It is so ordered.                                        *Reversed.*